**Otto RUSCHE, Plaintiff,**

v.

**Herbert BROWNELL, Jr., Attorney General of the United States, as Successor to the Alien Property Custodian,**

and

**Ivy Baker Priest, as Treasurer of the United States, Defendants.**

Civ. A. No. 2511–52.

United States District Court
District of Columbia.

Dec. 22, 1955.

**836**

George Eric Rosden, Washington, D. C., for plaintiff.

Dallas S. Townsend, Asst. Atty. Gen., Director, James D. Hill, Chief, Litigation Section, Walter T. Nolte, Samuel Z. Gordon, Attys., Office of Alien Property, Washington, D. C., for defendants.

THOMAS, District Judge.

This action came on for trial before the Court on April 25, 26, 27, 28 and 29, and May 2, 3, 4, 5, 9, 10, 11 and 13, 1955; and the Court, having heard the evidence adduced and the arguments of counsel, and having considered the briefs filed by counsel, now, after due deliberation, makes findings of fact and conclusions of law as follows:

## Findings of Fact

1. Plaintiff brings this suit to recover various stocks and bonds issued by domestic corporations and certain other properties vested under the Trading with the Enemy Act, 50 U.S.C.A. Appendix, § 1 et seq., by the Attorney General of the United States, as successor to the Alien Property Custodian. For the most part, the vested properties have been sold and this suit is for the proceeds amounting to approximately $1,000,000.

2. The properties were vested in 1950 and 1951 by the Attorney General's Vesting Orders No. 14640, dated May 8, 1950, (filed with the Federal Register on June 5, 1950, F.R. Doc. 50–4815; published June 6, 1950, 15 F.R. 3510), No. 14685, dated May 24, 1950, (filed with the Federal Register on June 5, 1950, F.R. Doc. 50–4822; published on June 6, 1950, 15 F.R. 3514), No. 14868, dated July 12, 1950, (filed with the Federal Register on July 25, 1950, F.R. Doc. 50–6536; published on July 26, 1950, 15 F.R. 4777), No. 18503, dated September 20, 1951 (filed with the Federal Register on September 26, 1951, F.R. Doc. 51–11608; published on September 27, 1951, 16 F.R. 9840) and No. 18560, dated October 16, 1951, (filed with the Federal Register on October 19, 1951, F.R. Doc. 51–12635; published on October 20, 1951, 16 F.R. 10762).

3. Plaintiff was born on February 1, 1883, in Schleibnitz, Germany, of German parents; he is and always has been a German citizen exclusively.

4. Plaintiff received his formal education in Germany. In 1906, after working for about a year in England, plaintiff returned to Germany for a brief period, and then left Germany for Mexico.

5. From 1906 to 1912, plaintiff worked in Mexico for the firm Enrique Schoendube, which was the representative in Mexico of the German company, Allgemeine Elektricitaets Gesellschaft. (hereinafter called "AEG").

6. AEG was and is a very large corporation incorporated in Germany, and doing business in Germany and in many other countries throughout the world. It manufactured and sold a wide variety of electrical products ranging from huge turbines and generators for power plants to home appliances. It is the German counterpart of Westinghouse or General Electric in the United States.

7. In 1912, plaintiff married the daughter of the owner of the Schoendube firm, she being a native citizen of Mexico. They had five daughters, all of whom are living with the exception of Hannah, who died in Germany in 1937.

8. In 1912, AEG established a subsidiary company in Mexico and plaintiff was appointed manager. Plaintiff retained this position until the early 1930's, and until that time he received his basic salary in Mexico from AEG.

9. From 1906 to the early 1930's, plaintiff resided in Mexico, although he spent part of his time in traveling and working for AEG in the United States and South America. Plaintiff made return visits to Germany during this period, but during the 1920's he spent very little time in Germany.

10. In 1925, plaintiff purchased a fourteen-room house at 27 Goethestrasse in the Zehlendorf section of Berlin, Germany. Plaintiff paid approximately 150,000 Reichsmarks or $60,000 for the house. AEG made the purchase for plaintiff. In 1926, plaintiff purchased another house at 5 Klaus Grothstrasse in the Charlottenburg section of Berlin, Germany, for some 60,000 Reichsmarks or $24,000.

11. Plaintiff retained ownership of these two houses until he sold his 5 Klaus Grothstrasse house in 1950, and his 27 Goethestrasse house in 1953.

12. Plaintiff and his family returned to live in Germany in the early 1930's, and resided in the 27 Goethestrasse house. Plaintiff was registered with the German police as residing at the 27 Goethestrasse house as early as February 18, 1931.

13. Plaintiff continued to work for AEG in Germany. In 1934 or 1935, he was appointed chief of the Overseas Department of AEG; and in February 1936, he was appointed a deputy member of the managing board of directors ("Vorstand") of the company. Plaintiff retained these positions continuously through 1944.

14. The main office, headquarters and commercial domicile of AEG and its Overseas Department prior to and from 1934 through 1944 was in Berlin, Germany.

15. The Overseas Department of AEG, during the period from 1934 through 1944, handled the company's business in countries over-the-seas, including England and Ireland. In 1937, the Overseas Department received, in addition, jurisdiction over the company's business in Russia and the Baltic States of Latvia, Lithuania and Estonia.

16. Under German law in general and as specifically applied to AEG during the period from 1936 through 1944, the managing board of directors performed the combined functions of officers and board of directors of an American corporation. The managing board of directors of AEG was the organ of AEG which actually managed and conducted the business of the company and it was the decisive and most important body of AEG in directing, supervising, controlling, managing and operating the company.

17. Under German law in general and as specifically applied to AEG during the period from 1936 to 1944, deputy members of the managing board of directors had all the rights, powers, functions, duties and privileges of regular members of the board, although their salaries were somewhat lower. Deputy members and regular members of the managing board of AEG were required to devote their full time to the company.

18. Under German law in effect from 1937 through 1944, the chairman of the managing board of directors could decide any differences of opinion within the board unless the by-laws provided otherwise. The by-laws of AEG did provide otherwise, for they specified that a majority of the managing board would prevail if there was a difference of opinion within the board and that the chairman could cast the deciding vote only where the board was otherwise equally divided.

19. From 1936 until April 1944, the managing board of directors of AEG met regularly twice a week in Berlin. From 1936 to March or April 1944, plaintiff, except when he was away on trips as found in paragraph 41 herein, regularly attended the meetings of the managing board of directors of AEG and fully participated in its decisions and deliberations.

20. From 1936 through 1944, AEG had a supervisory board ("Aufsichtsrat"). This was a board elected by the stockholders which had some veto powers over the managing board of directors and which selected the managing board. The supervisory board was not concerned with the day-to-day management and conduct of the business of AEG as was the managing board of directors.

21. The supervisory board of AEG held meetings irregularly, and these took place in Berlin. From November 1939 through March 31, 1944, the supervisory board met eleven times, seven of the meetings taking place after December 11, 1941. Plaintiff attended at least ten of these meetings as a deputy member of the managing board of directors.

22. It will be remembered that World War II in Europe commenced with the German invasion of Poland on September 1, 1939, and the United States entered the war against Germany on December 11, 1941.

23. On December 21, 1936, plaintiff entered into an employment contract with AEG for a salary of 30,000 Reichsmarks a year plus a guaranteed minimum bonus of 12,000 Reichsmarks a year, the bonus being tied to the profits of the company. In this contract plaintiff agreed to devote his full time to AEG. On April 8, 1937, plaintiff entered into a new employment contract with AEG under which he was to be paid a salary of 42,000 Reichsmarks a year plus a bonus which was made dependent upon the profits of the company in a specified formula. As in the earlier contract, plaintiff obligated himself to devote his full time to the company. This contract of April 8, 1937, was to be effective until September 30, 1938, and thereafter was automatically renewable for periods of one year each unless terminated by either of the parties on six months' notice. The contract of April 8, 1937, was modified by the parties on December 10, 1941, and on April 1, 1943. These modifications pertained to the formula for determining plaintiff's bonus, which, even after the modifications was still dependent on the profits of the company. Plaintiff continued to be employed by AEG until at least December 31, 1944; and his relationships with the company were governed by the contract of April 8, 1937, as modified on December 10, 1941, and April 1, 1943.

24. From at least 1936 through 1944, plaintiff received his annual salary and bonus from AEG in Germany. His total compensation kept increasing during this period. Thus, his salary and bonus from AEG totaled 57,000 Reichsmarks in 1938, 69,000 Reichsmarks in 1939, and 78,000 Reichsmarks in 1942, 1943 and 1944. In 1942, 1943 and 1944, plaintiff's annual salary from AEG was 42,000 Reichsmarks and his bonuses were 36,000 Reichsmarks each year.

25. During World War II and through at least 1944, AEG was the second most important industry in the electrical field for the German war effort. Among other things, AEG manufactured and sold to German industry and to the German government, its armed forces and official supply organizations, motors, turbines, generators, wire, cable and electrical power producing and distributing equipment of all kinds. By February 1941, AEG was 99% converted to war work. AEG employed as many as 100,000 employees during World War II, and the number kept increasing from 1941 through 1944. During these years the company maintained and operated numerous factories in Germany and its sales ran into the hundreds of millions of Reichsmarks each year. High priorities and allocations were received by AEG from the German government for this business.

26. Prior to and during the war and until March or April of 1944, plaintiff had a private office at the main administration building of AEG in Berlin and had at least one private secretary who worked for him almost exclusively.

27. In addition to his activities as a deputy member of the managing board of directors of AEG, plaintiff was chief of the company's Overseas Department. From 1934 or 1935 and thereafter until March or April 1944, plaintiff as chief of the Overseas Department directly and actively managed, supervised and controlled the operations of this Department.

28. On August 24, 1939, Germany and Russia signed a treaty of friendship which, among other things, called

for increased commercial intercourse between the two countries. Thereafter, plaintiff visited Russia on behalf of AEG, and on November 15, 1939, he reported to the supervisory board of AEG on the prospects of AEG exports to Russia.

29. Upon the execution of this treaty, AEG's business with Russia and the Baltic States, which was handled and supervised by its Overseas Department, increased very considerably, and by June 22, 1941, the date when Germany invaded Russia, AEG's sales and deliveries to, and its orders from, Russia and the Baltic States ran into the millions of Reichsmarks.

30. After June 22, 1941, and continuing in 1942, 1943, and 1944, the German armed forces occupied large parts of Russia and the Baltic States.

31. In order to facilitate its business in German-occupied Russia and the Baltic States, AEG established and maintained a number of offices in these territories. The Overseas Department of AEG in Berlin supervised and controlled these offices, decided questions of policy, staffed the offices with engineers and other personnel, and made the important decisions.

32. From December 11, 1941, to April 1944, AEG's business in German-occupied Russia and the Baltic States ran into the millions of Reichsmarks and this business was conducted and supervised by the Overseas Department of AEG. The customers for this business were the German Army and Navy and official German governmental supply organizations such as the Organization Todt, Energiebau Ost and Energieversorgung Ost. High German governmental priorities were received by the Overseas Department for its business in German-occupied Russia and the Baltic States.

33. Prior to December 11, 1941, and thereafter until March or April 1944, plaintiff, as chief of the Overseas Department of AEG and a deputy member of the managing board of directors of the company, actively directed and supervised the Overseas Department, including its operations in German-occupied Russia and the Baltic States. He was responsible for the conduct and operations of the Overseas Department and the several hundreds of persons employed in the Department. He decided the policies of the Department and its branch offices in occupied Russia and the Baltic States, personally detailed engineers and personnel to German-occupied Russia and the Baltic States, giving them directions for the setting up of offices in these countries, passed on questions of salaries and promotions in the Department and decided what personnel in the Department would be recommended for deferment from the German armed forces as essential to the German war effort.

34. From December 11, 1941, until March or April 1944, plaintiff frequently met and had business discussions in Berlin with his colleagues and subordinates in AEG and with persons outside of the AEG organization. During that period plaintiff personally visited the office of AEG in Riga on several occasions and had business consultations with its personnel.

35. To facilitate its work in German-occupied Russia and the Baltic States, AEG in 1942 and 1943 created subsidiary corporations—AEG Ostland, AEG Ostlandwerk, and AEG Ukraine—and plaintiff was appointed a member of the board of directors of these companies.

36. Prior to December 11, 1941, and thereafter until March or April 1944, plaintiff actively fulfilled his functions in Germany as a deputy member of the managing board of directors of AEG and as chief of its Overseas Department, and his activities in these capacities substantially aided the German armed forces and the German war effort.

37. Under German law in effect from April 1939 through at least 1944, only residents of Germany (with some exceptions not relevant here) employed in Germany were required to have work

record books ("Arbeitsbuch"), sometimes termed "labor passes." Such work record books were official documents issued by the German government and were of such importance that they were required under German law to be kept as a necessary part of a person's air raid shelter kit. Prior to December 11, 1941, and thereafter until April 1944, plaintiff was the recipient of the German work record book or labor pass No. 40/a20975 (occupation group 25—occupation type a-1).

38. From at least 1935 and thereafter until March 20, 1944, or April 1944, plaintiff was a settled and integrated member of the German community, living and working in Germany.

39. Plaintiff was never interned, imprisoned or sent to a concentration camp in Germany, and he was permitted by the German authorities to keep his position as a prominent German industrialist with AEG until he voluntarily left Germany in March or April 1944.

40. Plaintiff's wife left Germany for reasons of health, and went to Switzerland in the fall of 1941 and remained there until her death in April of 1945. One of her daughters, Margaret, accompanied and remained with her during that period. Plaintiff's daughter, Susanna, continued to live at the 27 Goethestrasse, Berlin, house and remained in Germany during the war until the summer or fall of 1943, when she left for Switzerland. Plaintiff's daughter, Maria Luisa, married Hansludwig Geiger, a German citizen, in Germany in April 1941, and thereafter remained in Germany throughout the war. Plaintiff's daughter, Ursula, remained in Germany or German-occupied territory throughout the war and until 1944, when she went to Switzerland.

41. During the period from December 11, 1941, to March or April 1944, plaintiff continued to reside in Germany and he spent most of his time there. Concerning the hiring of servants at 27 Goethestrasse, the maintaining of the residence there, and plaintiff's other activities in and around Berlin, there was much testimony which it is unnecessary to catalog. During this period plaintiff took three or four trips a year outside Germany at which times he went to the Baltic States on business for AEG or visited his wife in Switzerland. Until March or April 1944, plaintiff's absences from Germany approximated two to three months each year.

42. Under German law, persons residing in Germany were required to register with the German police. Plaintiff was registered with the German police as residing at 27 Goethestrasse, Berlin, from February 18, 1931, to December 12, 1944. While plaintiff's registration card with the German police shows a number of travels abroad and returns to the 27 Goethestrasse house from 1931 to 1936, plaintiff was registered as continuously residing at the house from September 1936 to December 12, 1944.

43. Plaintiff was regularly assessed and he paid income and property taxes in Germany prior to and throughout the period from 1939 through 1944. He was assessed and paid these taxes as a person subject to unrestricted tax liability. This means, under German law, that plaintiff was taxed as a resident of Germany.

44. Prior to and from 1939 to April 1944, plaintiff had free access to his income and property in Germany and he could use and dispose of these within Germany without a license from the German foreign exchange control ("Devisenstelle") authorities. This means, under German law, that plaintiff was deemed to be a resident of Germany.

45. Plaintiff received exemptions from the German government exempting his property outside of Germany from the German foreign exchange controls. Plaintiff claims that he would not have returned from Mexico in the early 1930's to live in Germany had he not received such exemptions. By letter to plaintiff dated February 10, 1941, the Reich Minister of Economics granted plaintiff an exemption of his property

in Mexico "from those restrictions to which you are subject by reason of your residence in Germany." The letter further states, "For the rest, the same basic rules apply to you as apply to other persons residing in Germany." The letter also states, "This arrangement shall be valid only so long as you maintain your residence in Germany exclusively, but not, however, after December 31, 1942." On October 20, 1942, this exemption was renewed and extended until December 31, 1944. After plaintiff changed his residence to Switzerland in 1944, this exemption was rescinded.

46. In plaintiff's income tax returns which he filed with the German government for 1942 and 1943, he stated he was present and working in Berlin, Germany, twenty-six days a month for twelve months each year.

47. Plaintiff authorized Hans Schwarzer, one of plaintiff's subordinates in AEG, to file plaintiff's German income tax return for the year 1944. Schwarzer, as attorney-in-fact for plaintiff, filed such a return with the German tax-authorities on March 28, 1945. Schwarzer stated in said return that plaintiff's 27 Goethestrasse house had been inhabited predominantly by plaintiff himself until December 1943, and that thereafter plaintiff was out of town on business for some time but that this was merely a temporary situation.

48. Throughout the war and until at least 1945, plaintiff maintained a sizeable bank account with the Deutsch-Suedamerikanische Bank, a German bank in Berlin. This bank noted on its records that plaintiff was abroad since the beginning of 1944. Plaintiff also purchased and sold substantial amounts of German Treasury bonds from 1942 to 1944.

49. During the period from December 11, 1941, until at least March or April 1944, plaintiff had a savings account in the Savings Bank of the City of Berlin termed an "iron savings" account and he had regular deductions made from his AEG salary and placed in that account.

50. Prior to and during the war until at least 1944, plaintiff was a member of the Deutsche Arbeits-Front ("DAF") or German Labor Front which was the trade union organization established by the Nazis and affiliated with the Nazi party. Plaintiff regularly paid his dues to this organization in Germany until at least April 1944.

51. In or about the year 1935, plaintiff while on a trip for AEG to the Far East, joined the Auslands-Organization (AO), which was a part of the Nazi party. Plaintiff retained his membership in the AO until at least April 1944, and until that time he regularly paid his monthly dues of ten Reichsmarks to that organization in Germany. Plaintiff wore the Nazi party badge.

52. During the war and until at least 1942, plaintiff was on the Board of Directors of the Committee on Commercial Policy of the Reich Chamber of Economics, Berlin. He was also on the Advisory Board of the Reich Group for Industry, Berlin, (Committee on Foreign Trade, Eastern Asia Committee, Committee on Export Credit Insurance). The Reich Chamber of Economics and the Reich Group for Industry were semi-official German organizations charged by the German government with important tasks in the conduct of the war economy.

53. In 1950, plaintiff applied to the German tribunals for denazification. In plaintiff's application for denazification, dated June 23, 1950, he stated that he resided at 27 Goethestrasse, Berlin, from 1935 to 1944, and thereafter in Switzerland. In connection with his denazification proceeding, plaintiff wrote to the Bavarian Ministry of State for Special Tasks on July 10, 1950, stating that he left Germany in the spring of 1944.

54. In connection with his denazification proceeding, plaintiff requested his son-in-law, Hansludwig Geiger, his Swiss attorney, Marco Antonini, and his attorney-in-fact in Germany, Emil Heckenbach, to file statements on his behalf with the denazification court, and these were written with plaintiff's consent and approval. In their statements to the

denazification court in the summer of 1950, these three persons stated in effect that plaintiff had resided in Germany during the war and until the spring of 1944. The denazification court exonerated plaintiff and in its decision recognized that plaintiff had been residing in Germany during the war and that he left Germany for Switzerland in 1944.

55. Under Swiss law a German national such as plaintiff could not reside in Switzerland during the period from 1939 through 1944 and thereafter without obtaining from the German government and submitting to the Swiss government a certificate of origin ("Heimatschein") and an excerpt from the German penal register. The certificate of origin was a certification by the German government that the person in question was a German national. The excerpt from the penal register was to show whether or not the person in question had a criminal record.

56. Plaintiff did not obtain a certificate of origin from the German government until June 15, 1944, or the excerpt from the German penal register prior to that date.

57. Plaintiff applied to the German government for another certificate of origin on September 6, 1951. In this application, plaintiff stated that he resided at 27 Goethestrasse, Berlin, from 1935 to 1944, and thereafter in Switzerland.

58. Plaintiff received German passport No. 11605/43a, dated February 9, 1944, issued by the German authorities in Berlin. Plaintiff's residence was listed therein as Berlin.

59. Under German law in effect from 1938 through at least 1944, a German citizen removing from Germany to another country was required to register with the German embassy or consulate in the country to which he removed. On May 25, 1944, plaintiff formally registered with the German consul at Montagnola, Switzerland, stating that he had moved from Berlin to Switzerland on March 19, 1944.

60. Under Swiss law, if plaintiff had resided in Montagnola and/or Lugano, which are separate municipalities in the Canton of Tessin, Switzerland, from 1939 to April 1944, as he claims, he would be required to be registered in the register of residents maintained by these municipalities. Plaintiff was not registered in these registers for this period. When plaintiff did live in these municipalities in 1944 and 1946, he was registered in their registers of residents for these years.

61. Under Swiss law, if plaintiff had resided in Montagnola and/or Lugano from 1941 to April 1944, he would have been required to pay four different kinds of taxes in Switzerland, viz., the Federal defense tax, the Federal defense levy, the Cantonal tax of Tessin and the Municipal taxes of Lugano and Montagnola. From prior to 1941 until April 1944, plaintiff was not assessed and he did not pay any of these taxes, although he had substantial income and property which would have been reached by these taxes had he been subject to them. When plaintiff did reside in Switzerland after March 1944, he paid taxes in Switzerland on his income and property.

62. In 1943, the Swiss Federal defense tax was levied on plaintiff's wife and two of his daughters, but not on plaintiff. Under Swiss law, if plaintiff had been residing in Switzerland, that tax would have been levied upon him as the head of the household.

63. Under Swiss law, plaintiff could not have resided in Switzerland from 1939 to 1944 without obtaining permits of residence from the Swiss government. These permits are of three kinds. Plaintiff did not receive any one of these permits of residence from the Swiss government during the period from 1939 to March 20, 1944.

64. On March 21, 1944, plaintiff received a permit from the Canton of Zurich, Switzerland, valid until March 29, 1944, for the purpose of "visit and moving to Lugano." The first residence permit which plaintiff obtained from the

Canton of Tessin was dated April 14, 1944, was valid until September 20, 1944, was for purposes of recreation and reasons of health and prohibited plaintiff from exercising any gainful occupation in Switzerland.

65. Plaintiff has been directed by discovery and pretrial orders in this case to produce for defendants' inspection copies of any residence permits granted to him by the Swiss government during the period from January 1, 1939, to the date of commencement of this action. Plaintiff has produced no such permits for the period from January 1, 1939, to March 20, 1944, although the same would be available to him from Swiss governmental sources had they been issued.

66. A permit to enter Switzerland under date of February 6, 1942, was issued by the Swiss Federal Aliens Police for plaintiff. Under Swiss law this is merely a permit to enter but not to reside in Switzerland and it did not dispense with the necessity, as found in paragraph 63 herein, that plaintiff had to receive residence permits in order to reside in Switzerland. Moreover, the entry permit of February 6, 1942, states that it would expire if a Swiss visa was not granted to plaintiff within one month. There is no evidence that such a visa was granted to plaintiff within the one-month period.

67. On October 17, 1941, plaintiff in Berlin addressed a letter to the Swiss Federal Aliens Police in Berne, Switzerland, requesting a permit for a "permanent stay in Switzerland." As of April 7, 1944, this request was not granted, and it appears that plaintiff was not granted a permit for a permanent stay in Switzerland until January 23, 1951.

68. Plaintiff testified that he worked for AEG in Switzerland from May 1939 to April 1944. Under Swiss law, plaintiff would not have been permitted to work in Switzerland during that period without special permits from the Swiss government. There is no evidence that plaintiff received any such permits from the Swiss government for any part of this period. The permits for temporary residence which plaintiff received from the Canton of Tessin after March 1944, specifically prohibited him from undertaking any gainful employment.

69. Plaintiff testified that while he had removed from Germany to Switzerland in May 1939, and had his residence and domicile in Switzerland thereafter until March 1944, he merely created an appearance of residing in Germany during that period in order to avoid having to pay the German capital flight tax. The Court finds that plaintiff's testimony is contrary to the weight of the evidence and finds that plaintiff, in fact, voluntarily resided in Germany throughout this period.

70. Under German law the capital flight tax was a tax imposed by the German government on certain categories of persons who abandoned their German residence or domicile. This tax was in effect from December 1931 until 1953. The amount of the tax was one fourth of the person's total property as assessed in the last property tax assessment received by the taxpayer prior to abandoning his German domicile or residence. Persons subject to the tax who left Germany without paying the tax were liable to having their property in Germany confiscated and to fine and imprisonment.

71. Under German law, persons who were not domiciliaries or residents of Germany as of December 31, 1927, were not subject to the capital flight tax, and mere ownership of a house in Germany did not constitute the owner a domiciliary or resident of Germany. Furthermore, under German law, if a person had been domiciled or resident in Germany but had abandoned these prior to December 31, 1927, and returned to Germany thereafter, he would not be subject to the capital flight tax.

72. Plaintiff was not a domiciliary or resident of Germany as of December 31, 1927, and, hence, he was not subject to the capital flight tax.

73. The capital flight tax was never levied against plaintiff or his property; he never paid the tax nor was his prop-

erty in Germany confiscated for non-payment of the tax, and plaintiff was never subjected to fine or imprisonment in Germany for nonpayment of the tax, although plaintiff owned substantial properties in Germany until 1953.

74. Plaintiff filed a formal notice of claim, dated September 27, 1951, with the United States Department of Justice, Office of Alien Property, in which plaintiff requested a return of the vested properties. The notice of claim was sworn to and filed on plaintiff's behalf by his attorney and agent. Plaintiff represented in his notice of claim that he was "probably stateless". On August 24, 1949, in reply to a questionnaire from the United States Department of Justice, Office of Alien Property, requesting a statement of his activities since 1938, plaintiff failed completely to mention his activities in Germany from September 1, 1939, to April 1944 as a deputy member of the managing board of directors of AEG and chief of its Overseas Department as found herein, and plaintiff represented that his activities in AEG ceased upon the outbreak of the war.

75. Plaintiff has failed to comply with the discovery order of this Court of February 17, 1953, and the pretrial order of this Court of February 8, 1954, directing plaintiff to produce various documents for defendants' inspection prior to trial. Thus plaintiff failed to produce, *inter alia,* a copy of his application for denazification dated June 23, 1950, and a copy of his application for a certificate of origin dated September 6, 1951, said documents containing admissions by the plaintiff that he resided in Germany, not Switzerland, from 1935 to 1944. (See findings 53, 55, 57.)

76. In alleged compliance with the discovery and pretrial orders of this Court plaintiff has produced for defendants' inspection spurious and incomplete documents. Thus, plaintiff failed to produce a true copy of his letter of July 10, 1950, to the Bavarian Ministry of State for Special Tasks in which he admitted that he left Germany "in the spring of 1944" (see finding 53); instead, plaintiff produced an alleged copy of this letter which is almost identical with the true copy except that it omitted the aforementioned quoted words. Furthermore, plaintiff produced for defendants' inspection an incomplete copy of his 1942 income tax return, said copy being incomplete in that it omitted an enclosure to the return showing that plaintiff traveled to work in Berlin from his 27 Goethestrasse house 26 days a month for 12 months during the year.

77. Plaintiff testified that in May 1939 he saw that war was coming and that at that time he tried to establish his domicile or residence in Switzerland; that he rented an apartment at the Hotel Bellevue in Montagnola, Switzerland, to which he and his wife moved in May 1939; that he lived at this apartment until October 1941, at which time he and his wife moved to a four-room apartment at the Clinic San Rocco in Lugano, Switzerland; that he kept the same apartment at the Clinic until his wife died there in April 1945; that although from May 1939 he continued to be the chief of the Overseas Department of AEG and a member of the managing board of directors, his field of work was shut off or closed upon the outbreak of war in September 1939, and that thereafter the Overseas Department merely concerned itself with "winding up the internal accounting"; that after May 1939 and throughout the war he worked for AEG in Switzerland; that during the entire period between December 7, 1941, and the beginning of 1944, he went merely three or four times to Berlin; that he spent only ten weeks in Germany in 1941, two weeks in 1942, five or six weeks in 1943, and three weeks in 1944; that his removal to Switzerland in May 1939 and his work in Switzerland for AEG was done with the consent of the chairman of the managing board of directors of AEG, Dr. Buecher, who insisted, however, that this arrangement be kept secret from plaintiff's colleagues in the company; and that plaintiff did not inform the German government of his

removal to Switzerland and sought to make it appear that he continued to reside in Germany during the war to avoid the German capital flight tax.

78. The Court finds that this testimony is contrary to the great weight of the evidence and that the facts as to plaintiff's residence and activities from May 1939 to April 1944 are as found and set forth herein.

79. Plaintiff lived, worked, and was voluntarily resident within Germany, not Switzerland, prior to and from December 11, 1941, until at least March 20, 1944, and probably until April 1944.

80. Prior to and from December 11, 1941, until at least March 20, 1944, and probably until April 1944, plaintiff actively fulfilled his functions and duties in Germany as a deputy member of the managing board of directors of AEG and chief of its Overseas Department. During this period plaintiff was doing business within Germany and parts of Russia and the Baltic States which were occupied by Germany and its military and naval forces.

81. Prior to and from December 11, 1941, until April 1944, plaintiff acted for and on behalf of and as an agent for AEG; and plaintiff, as a deputy member of the managing board of directors of AEG and chief of its Overseas Department, helped to direct, manage and supervise this company which furnished war materials to the German government and its armed forces. Plaintiff thus aided the German war effort both within Germany and German-occupied Russia and the Baltic States.

82. Prior to 1940, plaintiff was the owner of the properties in suit which were then held in an account in his name in the Chase National Bank in New York. Thereafter, and until the dates of vesting, plaintiff retained beneficial ownership of said properties, although in 1940 he had nominally transferred them to Cia Constructora y Administradora S.A., a Mexican corporation, the majority of whose stock was owned by plaintiff until sequestered by the Mexican government in 1944 and confiscated in 1951.

83. Cia Constructora y Administradora S.A. paid no consideration for the transfer to it in 1940 by plaintiff of the properties in suit; the transfer was not a gift and plaintiff and the Company agreed that the latter would hold the properties for plaintiff.

## Conclusions of Law

1. The Court has jurisdiction of the subject matter of this action pursuant to Section 9(a) of the Trading With the Enemy Act, as amended 50 U.S.C.Appendix, § 9(a), and of the parties hereto.

2. Plaintiff was the beneficial owner of the properties in suit immediately prior to the vesting thereof by the Attorney General of the United States.

3. Plaintiff was an enemy within the meaning of Sections 2 and 9(a) of the Trading With the Enemy Act, as amended, in that he was voluntarily resident within Germany, an enemy country, after December 11, 1941, and until March or April of 1944; hence, plaintiff is barred from recovering the vested properties.

4. Plaintiff was an enemy within the meaning of Sections 2 and 9(a) of the Trading With the Enemy Act, as amended, in that he was resident outside of the United States and was doing business within Germany and territories occupied by the German armed forces after December 11, 1941, and until at least March or April of 1944; hence, plaintiff is barred from recovering the vested proper-vested properties.

5. Plaintiff suffers from enemy taint and was therefore an enemy within the meaning of Sections 2 and 9(a) of the Trading With the Enemy Act in that during the period from December 11, 1941, until at least March or April of 1944, he acted for and on behalf of and as an agent of Allgemeine Elektricitaets-Gesellschaft (AEG), an enemy corporation, and during this period plaintiff as

a deputy member of the managing board of directors of AEG and chief of its Overseas Department helped to direct, manage, and supervise this corporation which furnished war material to the German government and its armed forces and aided the German war effort both within Germany and German-occupied Russia and the Baltic States; hence, plaintiff is barred from recovering the vested properties.

6. The Attorney General of the United States lawfully vested, and defendants are entitled to retain as against plaintiff herein, the properties which are the subject of this suit and the proceeds thereof.

7. Judgment must therefore be rendered in favor of the defendants, denying recovery to plaintiff.