Werner C. von CLEMM, and Rayford W. Alley, Trustee, co-partners under the name of Bridge Import Company, a co-partnership, and Werner C. von Clemm, individually, Plaintiffs,

v.

Elizabeth Rudel SMITH, Treasurer of the United States, Robert F. Kennedy, Attorney General of the United States, and Pioneer Import Corporation, Defendants,

and

International Mortgage & Investment Corporation (derivatively by Edward H. Heims, et al.), and all other shareholders similarly situated, et al., Intervenor Defendants.

No. 60 Civ. 2696.

United States District Court
S. D. New York.

Nov. 23, 1965.

**354**

Alexander Kahan, New York City, for plaintiffs; Abraham L. Wax, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., New York City, for defendants; Thomas H. Baer, Asst. U. S. Atty., Carl F. Goodman, Department of Justice, of counsel.

Butler, Koehler & Tausig, Washington, D. C., for intervenor defendants International Mortgage & Investment Corporation and Heims Group; John Geyer Tausig, Washington, D. C., of counsel.

George Eric Rosden, Washington, D. C., and Waldemar J. Dittmar, New York City, for intervenor-defendants (Kroch Group).

McLEAN, District Judge.

This is a suit in equity begun in July 1960 pursuant to Section 9(a) of the Trading with the Enemy Act ("the Act") (50 U.S.C. App. § 9(a)) to recover certain property, or the proceeds thereof, vested in the Alien Property Custodian under Section 5(b) of the Act (50 U.S.C. App. § 5(b)) by Vesting Orders No. 354 dated November 11, 1942, and 4754 and 4755 dated March 14, 1945. Vesting Orders No. 4754 and 4755 were subsequently amended on June 18, 1948. Section 9(a) of the Act authorizes the institution of such an action, which therefore arises under the laws of the United States. Jurisdiction is thus based upon 28 U.S.C. § 1331.

Although in form an action against the Attorney General as successor to the Custodian, the suit in substance is one against the United States. Banco Mexicano de Commercio e Industria v. Deutsche Bank, 263 U.S. 591, 44 S.Ct. 209, 68 L.Ed. 465 (1924).

The property vested consisted of (a) 95 shares, constituting all the outstanding stock, of Pioneer Import Corporation ("Pioneer"), a New York corporation, (b) 6 packages of diamonds, and (c) 270 packages of synthetic and semi-precious stones. The diamonds and the stones were sold by the Alien Property Custodian subsequent to the vesting for $350,-129.45 and $941,866.72 respectively. Plaintiff von Clemm claims to be the owner of all the stock of Pioneer, of which he was president and general manager, and thus he claims to be entitled to

its return. He also claims that Pioneer was the owner of the diamonds and of seven packages of the stones and that Pioneer is entitled to their proceeds. He further claims that Bridge Import Company ("Bridge"), a co-partnership of which he was the only general partner,[1] was the owner of the remaining 263 packages of stones and is entitled to their proceeds.

Pioneer was originally a plaintiff in this action. By order of this court dated January 11, 1961, Pioneer was stricken as a party plaintiff on the theory that the Alien Property Custodian, who had been in control of the corporation since its vesting, had not authorized it to begin this suit. Pioneer was made a party defendant. *Pioneer Import Corporation v. Rogers,* 190 F.Supp. 529 (S.D.N.Y.1960).

The Alien Property Custodian has filed an answer on its behalf seeking dismissal of the complaint.

The parties agree that if this court holds that von Clemm has established his right to the Pioneer stock and if this court directs that the stock be returned to him, then Pioneer should be reinstated as a party plaintiff, in which event the court must pass upon Pioneer's claim to the proceeds of the diamonds and of the seven packages of stones, a claim which von Clemm has asserted on its behalf.

The intervenors are two different groups of stockholders of International Mortgage and Investment Company ("IMC"), a Maryland corporation. They assert that IMC owned the stock of Pioneer and that it also owned the diamonds and the stones. These parties were permitted to intervene for defensive purposes only, i. e., they may defend against plaintiff's claim, but they may not secure an affirmative determination in favor of their own claim. *International Mortgage & Investment Corp. v. Von Clemm,* 301 F.2d 857 (2d Cir. 1962).

Section 9(a) of the Act provides that:

"Any person not an enemy or ally of enemy claiming any interest, right, or title in any money or other property which may have been conveyed * * * or paid to the Alien Property Custodian or seized by him hereunder and held by him * * `* may file with the said custodian a notice of his claim under oath * * * and the President * * may order the payment * * * or delivery to said claimant of the money or other property so held by the Alien Property Custodian * * *. If the President shall not so order * * * said claimant may institute a suit in equity * * * in the district court of the United States * * * to establish the interest, right, title, or debt so claimed, and if so established the court shall order the payment * * * or delivery to said claimant of the money or other property so held by the Alien Property Custodian * * *."

It is conceded that plaintiff von Clemm made timely application for the return of the property which he claims and that the application was not granted.

There are two issues in this case, which are manifest from the language of the statute itself: (1) were plaintiffs an "enemy" or an "ally of enemy" within the meaning of the statute? (2) if not, were they the beneficial owners of the vested property at the time of its vesting?

Plaintiffs have the burden of proof on both issues. *Societe Internationale, etc. v. Rogers,* 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958); *Manufacturers Trust Company v. Kennedy,* 291 F.2d 460 (2d Cir. 1961).

*The Issue of Enemy Status*

This issue comes down to whether or not von Clemm, individually, was an enemy or an ally of an enemy, for if he

---

1. Von Clemm claims to have had a 50 per cent interest in Bridge. There were two limited partners, Rayford W. Alley, as trustee for von Clemm's two children, and Georges Lambercier, a Swiss national. Each allegedly had a 25 per cent interest in Bridge. The partnership interests in Bridge were also vested in the Alien Property Custodian by Vesting Order No. 353, dated November 11, 1942, but no claim for their return has been asserted in this action.

was, then he cannot recover the stock of Pioneer, and in that case Pioneer cannot be considered to be a plaintiff, and hence cannot recover the proceeds of the diamonds and the seven packages of stones. Similarly, if von Clemm was an enemy or an ally of an enemy, Bridge cannot recover the proceeds of the 263 packages of stones, for under such circumstances von Clemm could not assert a claim for the proceeds as general partner of Bridge, and Alley, a limited partner, does not have a property interest in Bridge's assets sufficient to entitle him to prosecute this action under Section 9(a). Alley v. Clark, 71 F.Supp. 521 (E.D.N.Y.1947).

Section 2 of the Act (50 U.S.C. App. § 2) provides as follows:

"The word 'enemy,' as used herein, shall be deemed to mean, for the purposes of such trading and of this Act—

(b) The government of any nation with which the United States is at war, or any political or municipal subdivision thereof, or any officer, official, agent, or agency thereof." [2]

The government contends that von Clemm was an agent of Germany, a country with which the United States was at war after December 11, 1941. It concedes that to come within the statute, von Clemm must have been such an agent after war was declared. The government also contends that even if von Clemm was not an agent of the German government, he was "enemy tainted," a more elusive concept which has its origin in certain cases hereinafter discussed. Von Clemm, on the other hand, contends that at no time was he an agent of Germany. He says that he was merely an American citizen engaged in the import business. He contends further that in any event he

did nothing after war was declared on December 11, 1941, and hence could not be an agent of an enemy, whatever he might have done for Germany before the war. He contends that the doctrine of enemy taint is wholly inapplicable to this case.

The testimony in this action was voluminous and the exhibits were numerous. Much of this material turns out to be irrelevant to the critical issues which determine the case. Upon the basis of all this evidence, I find the essential facts to be as follows.

Werner C. von Clemm, whose name at birth was Werner Clemm von Hohenberg, was born in Mainz, Germany, in 1898. He lived in Germany until 1922. After serving in the German Army in World War I, he had various employment in Germany, including a job with Hardy & Co., a firm of private bankers in Berlin, the senior partner of which von Clemm knew socially. His contact with this firm was to prove useful to him in later years.

Von Clemm's family was well established in Germany. One of his sisters was married to a general in the German Army. Another was married to a general in the German Air Force. A cousin was the wife of von Ribbentrop, ultimately Hitler's foreign minister. Another cousin was a "right-hand man" of Admiral Canaris, a high official in German intelligence under Hitler. Leising and Hoepfner, two business associates who figure prominently in the events hereinafter related, were members of the Nazi party. Von Clemm's twin brother, Carl von Clemm, who figures even more prominently in these events, was obviously on good terms with Hitler's government,

2. This is the only definition which need be considered here. The definitions of "enemy" appearing in Section 2(a) and 2(c) of the Act are not applicable because they do not apply to residents of the United States, corporations incorporated within the United States, or American citizens. Von Clemm was an American citizen and a resident of the United States and Pioneer was incorporated in New York.

The phrase "ally of enemy" also need not be considered, for it refers to a nation which is an ally of a nation with which the United States is at war. Since the nation here involved was Germany, with which the United States was at war, there is no need to concern ourselves with allies of Germany.

whether or not he was a member of the Nazi party, for during the early years of the war, he was an official in the German Embassy in Rome. The relation between von Clemm and his twin brother was at all times very close.

In 1922, von Clemm emigrated to the United States. When he did so, he dropped the "von Hohenberg" from his name. He has lived in the United States ever since. He married an American wife. Their children were born and educated here. He became a naturalized American citizen on September 8, 1932.

Carl von Clemm came to the United States with Werner in 1922 but stayed only a few years. In 1929 he returned to Germany where he has since lived.

Between 1922 and 1938 von Clemm had a number of different jobs in New York, at first a bank clerk, then a bond salesman, and later a customer's man in various brokerage houses. Thereafter he worked for a few years in an importing firm. In 1935 he went to work for Davis & Co., importers of oil equipment from Germany, a contact which was useful to him, as will hereinafter appear.

Von Clemm left Davis & Co. in the spring of 1938, to "lay the groundwork" for the organization of Pioneer, which was organized later that year. This "groundwork" consisted of a study of certain Treasury Department rulings, followed by a visit to Germany in the summer of 1938.

A Treasury Department ruling issued on December 23, 1936 dealt with the payment for goods imported from Germany. It had to do with Section 303 of the Tariff Act of 1930 (19 U.S.C. § 1303) which in substance provided that if any "bounty or grant" were paid with respect to any foreign merchandise, then upon the importation of such merchandise into the United States, additional duty would be assessed. The ruling of December 23, 1936 provided in substance that this statute would not be violated and that no bounty or grant would be involved if payment of the purchase price of the imported goods was made in whole or in part with the use of "controlled mark credits," i. e., marks on deposit in Germany, the free transfer of which had been blocked by German foreign exchange regulations. The ruling provided that the credits so used must have been "from the time they became subject to German governmental control, continuously owned by the person for whose actual account the merchandise is purchased for direct or indirect shipment to the United States."

Von Clemm conceived the idea of organizing a company to import goods from Germany to be paid for in part by such "continuously owned blocked marks." These marks could be purchased in various European financial centers, such as Amsterdam, at a substantial discount from the rate of exchange applicable to freely transferable marks. Von Clemm did not own any "continuously owned blocked marks." He went to Germany in the summer of 1938 to find some.

Von Clemm's twin brother Carl was then employed in Germany by a firm known as Eurotank Handelsgesellschaft, m.b.H. ("Eurohandel"), a company apparently controlled by Davis & Co., the company which, as heretofore noted, von Clemm had recently worked for in New York. Herman Leising and Carlos Hoepfner were associates of Carl von Clemm in Eurohandel.

Von Clemm conferred with Carl and Leising in the summer of 1938 in Germany. He sought to discover an owner of "continuously owned blocked marks." Leising suggested IMC. This company had been organized by Hardy & Co., for whom von Clemm had worked in Germany years before. Indeed, von Clemm himself had for a time been a director of IMC, although he had not been active in that capacity.

IMC was a Maryland corporation, but apparently many, if not all, of its stockholders were Germans. It had done an extensive business in Germany investing in mortgages, which it was able to buy at a discount. Through a subsidiary, Gesellschaft für Hypothekenankauf ("GFHA, Berlin"), it held substantial quantities of marks on deposit in Ger-

man banks, the free transfer of which was blocked by the German regulations. These qualified as "continuously owned blocked marks." A Dr. van Meer, a Dutch banker in Amsterdam, was a director of IMC and was thought by Leising to be interested in selling these blocked marks at a discount. Leising believed that, presumably by working through Hardy & Co., he could arrange for such sales to a company to be organized by von Clemm. A permit from the German foreign exchange control authorities was necessary for the transfer of blocked marks. Carl von Clemm and Leising believed that such a permit could be obtained.

The exact nature and extent of von Clemm's activities while in Germany in 1938 was never fully explained. It is at least clear that von Clemm received assurances which were sufficient to induce him to go ahead with his plan. He returned to New York and in November 1938 incorporated Pioneer under the laws of New York. It had an authorized capital of 100 shares of no par value stock.

The issuance of the stock of this corporation is a somewhat complicated subject. For present purposes, it is enough to say that five shares were issued in the name of Banque Commerciale of Luxembourg. Von Clemm instructed Banque Commerciale to hold this stock as trustee for IMC. The consideration for these five shares was $500. Von Clemm himself provided the $500, but instead of paying it in to Pioneer, he sent it to Banque Commerciale, instructing Banque Commerciale to pay this sum to Pioneer for the five shares. Banque Commerciale complied.

The reason for the employment of this somewhat devious method was eventually explained. Von Clemm wanted it to appear that Banque Commerciale, as trustee for IMC, had purchased the stock. The reason that he wanted it so to appear was that under the Treasury Department ruling of December 23, 1936, as previous-

ly noted, the purchase price of goods imported from Germany could be paid for in blocked marks only if those marks, from the time when they had first been blocked by the German foreign exchange control, had been "continuously owned" by the person for whose account the merchandise was purchased for import. Pioneer, which was not organized until November 1938, obviously had not owned any blocked marks continuously since the German foreign exchange regulations went into effect. These regulations antedated 1938 by several years. Von Clemm individually had not continuously owned any blocked marks either. But IMC had. Therefore, it was necessary to make it appear that IMC owned the stock of Pioneer, so that Pioneer could use the blocked marks continuously owned by IMC in payment of the price of the imported goods.

On several different occasions subsequent to Pioneer's incorporation, von Clemm represented to the United States Treasury authorities that Pioneer was a wholly owned subsidiary of IMC. Pioneer's federal income tax returns for 1939 and 1940 also contained such a representation.

Having thus set up Pioneer to engage in the import business within the framework of the Treasury regulations, von Clemm in late 1938 or early 1939 began operations on a wide scale. Whether or not he was the actual owner of Pioneer, there is no doubt that he was its sole manager and in complete control of its operations. Hoepfner, Carl von Clemm's associate, was made a vice president of Pioneer, a position which he held at least until May 1941.[3]

Pioneer proceeded to purchase various goods from Eurohandel, paying for them in part with blocked marks. Carl and Hoepfner on behalf of Eurohandel did the exporting of the goods from Germany, and von Clemm, as manager of Pioneer, did the importing into the United States. They dealt at first in a variety of goods

---

3. There is some question as to the authenticity of his resignation, which purports to be dated April 30, 1941. The date has obviously been tampered with.

—toys, vacuum bottles, lily pips, for example—goods which are not involved in this case.

Von Clemm's procedure in paying for these goods was informal. Whether or not such methods were or are customary in the import business, as von Clemm testified, they manifest at least the closeness of von Clemm's relation with his brother and with Leising. The method consisted of the transmission by Pioneer of dollars from time to time to Banque Commerciale in Luxembourg, and apparently also to banks in Holland, to be disbursed by those banks in accordance with instructions to be given them by Carl and Leising. Von Clemm gave Carl and Leising complete authority to act on behalf of Pioneer in handling these payments.[4] Carl or Leising used these funds in part to purchase blocked marks from IMC's subsidiary GFHA, and in part to purchase free marks at the regular rate of exchange of 40¢ per mark. Carl and Leising arranged for the payment to Eurohandel of the purchase price of the merchandise. Part of the price was paid in blocked marks and part in free marks, usually 50 per cent in each. Of course, in Germany a mark was a mark, so to speak, and it made no difference to Eurohandel as long as it received the right number of marks how its customer had acquired those marks.

An account was opened in a German bank, the Deutsche Bau und Boden Bank ("DBB"), and later in Reichskreditgesellschaft ("RKG"). The name of the account was "IMC-subaccount Pioneer." The blocked marks which had been purchased from GFHA were deposited in this account. Payments were made out of this account upon the instructions of Carl or Leising to Eurohandel to pay the portion of the purchase price payable in blocked marks. The bank from time to time sent debit advices, addressed to IMC, % Pioneer, evidencing these payments.

Permission of the German foreign exchange control authorities for payment out of this blocked mark account was obtained by Carl or his associates.

It is suggested by the intervenors that actually there were no blocked mark sales by IMC at all. The evidence does not support this contention. I find that IMC, through its subsidiary GFHA Berlin, did in fact sell blocked marks to Pioneer.

The transmission of funds by Pioneer to banks in Luxembourg and Holland was possible only up to May 10, 1940, when those countries were overrun by the German Army. The procedure I have described is the procedure which was followed up to that time. Thereafter, Pioneer transmitted funds to Switzerland. As far as appears, little or none of these funds transmitted to Switzerland was used to purchase blocked marks. The German foreign exchange control authorities declined to permit blocked mark transactions after mid-1940. The semiprecious stones with which we are directly concerned in this action were not purchased with blocked marks, but with dollars. As to the diamonds, as will subsequently appear, only one purchase of diamonds was completed by von Clemm. This was also paid for in dollars.

In September 1939, the war began with the German invasion of Poland.[5] Von Clemm's troubles then began as well. The British set up a blockade of Germany and established censorship of mail to and from Germany. In approximately April 1940, von Clemm began a series of practices which he continued to the end and which gave a marked conspiratorial cast to all his dealings. He invented an elaborate private code in which he couched his correspondence. He invented aliases for his correspondents, Carl and Leising

---

4. This authority was referred to as a "power of attorney" but no written power of attorney was ever produced and at one point von Clemm testified that perhaps the power of attorney was oral. In any case, there is no doubt that the authority existed.

5. Von Clemm commented with some satisfaction on this event in a letter to Hoepfner dated October 6, 1939. He was sorry for the Poles, but he liked the idea of being able to travel to East Prussia "without going through drafty corridors."

and Hoepfner, often several different aliases for the same man. He invented addresses for these fictitious personalities in various neutral countries. For example, "De Jager" in Switzerland, "Jao da Conceicao" and "Miguel Loanda & Cie" in Lisbon were each in reality Carlos Hoepfner in Germany. Francesco Da Vinci, whose address varied from one Italian city to another, was in reality Carl von Clemm in Germany. Swiss aliases in abundance appear in the later years. Von Clemm sent letters addressed to these "figments of his imagination" to forwarders in neutral countries, who sent them on to the true addressees in Germany.

Carl and Hoepfner on their end also used code in their letters to von Clemm. They used many aliases for von Clemm, individually, or for Pioneer. A few examples out of many are "Doyle & Co." for Pioneer and "Bill Reck" for von Clemm.

Von Clemm's stock explanation of this mysterious behavior was that he and his German correspondents were trying to fool the British censors. The inference is hard to avoid that he had at least in later years another purpose, i. e., to deceive the investigating officials of the United States Treasury Department.[6]

In October 1939 Carl resigned from Eurohandel, after what von Clemm described as a "palace revolution," i. e., apparently a controversy with Davis. Leising and Hoepfner resigned shortly thereafter. The three of them then organized a German firm known as International Mortgage Handelsgesellschaft m.b.H. ("IMICO"). Thereafter all Pioneer's purchases were from Imico. Imico enjoyed a highly favorable position vis-á-vis the German government, as events about to be related will demonstrate.

Von Clemm went to Germany for a visit in 1939, shortly before the outbreak of the war. He conferred there with Carl and Leising and Hoepfner. He also called on the German Economic Ministry and talked with an official named Cremer, later to assume importance in the diamond transactions. Just what von Clemm did in Germany on this visit was never adequately explained. I have no doubt that he realized that war was imminent and that he tried to prepare for that eventuality. For one thing, he must have discussed setting up the codes and the false names. He also appears to have discussed plans for transmitting funds to Switzerland. Perhaps he anticipated that Luxembourg and the Netherlands might eventually cease to be available. It seems highly probable that Carl's forthcoming resignation from Eurohandel and the organization of Imico was also under consideration at that time.

Von Clemm's testimony on the subject of his 1939 conversations in Germany is far from lucid. Leising, who testified by deposition, was not very communicative. Carl von Clemm's testimony was not taken by deposition nor was he called as a witness at the trial.[7]

Before I turn to the transactions which are directly involved here, the diamonds and the semi-precious stones, mention

6. An example of such conduct occurred in 1940 when von Clemm in New York received a letter which referred to "Dutch" diamonds. He apparently considered that the presence of such a letter in his files would be undesirable, so he cut out the word "Dutch," leaving a hole in the page. He then wrote to Hoepfner saying he had received a letter with a hole in it, suggesting that the word cut out was undoubtedly "Hanau," and requesting Hoepfner to obtain a duplicate of the letter. In due course Hoepfner sent to von Clemm a purported copy of the letter which contained the word "Hanau" in the right place. The fraud was exposed, however, in two ways. The British censor in Bermuda intercepted another copy of the original letter in which the word was indubitably "Dutch." Moreover, von Clemm himself, shortly after receipt of the original letter, quoted it in full in a letter which he sent to an American dealer, and the word in the letter which he quoted was "Dutch."

7. Carl was unwilling to come to the United States to testify because of the fact that he has never stood trial upon a conspiracy indictment returned against him, Werner von Clemm and others in 1942.

should be made of the fact that in the late fall of 1940, von Clemm in New York began operating the business which he had previously conducted through Pioneer under the name of F. M. Alison & Company ("Alison").[8] No written instrument embodying any transfer of the assets or liabilities of Pioneer to F. M. Alison & Company was ever executed, as far as appears. Orders placed by Pioneer were filled by shipments to Alison. There is nothing to indicate that these orders were ever assigned by the former to the latter. Apparently all that occurred was that von Clemm, who had previously called himself Pioneer, now called himself Alison. Moreover, he was not entirely consistent in this, for some shipments, notably the diamonds, continued to arrive addressed to Pioneer.

In April 1941 Alison disappears from the scene and Bridge emerges. This entity at least was embodied in a partnership agreement. Von Clemm was the only general partner. Alley, as trustee for von Clemm's children, was a special partner. Georges Lambercier of Switzerland was a special partner. Lambercier authorized an employee in von Clemm's office to sign his name to the partnership agreement. In fact, von Clemm supplied the entire capital, $15,000, for all three. He put up $5,000 for himself, $5,000 for Alley and $5,000 for Lambercier. The $5,000 for Lambercier, characteristically, was paid by von Clemm to Switzerland so that Lambercier could send it back to New York and thus appear to have contributed it himself.

In this instance, von Clemm went through the form of invoicing goods from Pioneer to Bridge and from Bridge to the ultimate buyer. Both sets of invoices were prepared simultaneously as part of the same typing operation. Bridge retained at least part, if not all, of the profit on these transactions. There is nothing to show that Bridge ever assumed Pioneer's liabilities. Goods ordered by Pioneer arrived addressed to Bridge. Here, as in the case of Alison, von Clemm seems to have operated a continuous business, merely changing the name under which he conducted it.

He suggested that the reason for this was that Pioneer was becoming too well known to the British. It is clear that he also considered that it was becoming too well known to the American authorities. Goods shipped from Europe to Pioneer were being detained by the United States Customs. The same proved to be true with Alison and Bridge. Substantially all, if not all, shipments to Alison were held up. This is doubtless why, after only approximately four months, von Clemm dropped the Alison name and began to operate as Bridge. The change in name turned out to be futile. All shipments to Bridge were detained by Customs, including the semi-precious stones here involved which were eventually vested in the Custodian.

On April 10, 1940, the President, acting under the authority of Section 5 of the Act (50 U.S.C.App. § 5), issued Executive Order 8389, the basic "freezing order," which required a Federal Reserve Board license for the payment of the price of any goods in which any foreign country, or national thereof, specified in the order had any interest. The foreign countries first specified were Norway and Denmark, which had recently been overrun by the German Army. The order was extended to cover the Netherlands, Belgium and Luxembourg on May 10, 1940, after the occupation of those countries by the Germans. It was extended to cover Germany and other European countries, including Switzerland, on June 14, 1941, a date almost six months before the United States and Germany went to war. After May 10, 1940, therefore, von Clemm was obligated to apply for a license in order to make payment for goods imported by him, under any of his various names, from Belgium, and similarly, after June 14, 1941, from Germany and Switzerland.

---

8. This "trade name" is a combination of the names of von Clemm's children, Frederick Michael and Alison.

### The Diamond Transactions

On May 21, 1940, von Clemm sent a memorandum to "Signor Francesco Vinci, Bologna, Italy," i. e., Carl von Clemm in Berlin, Germany. The memorandum stated:

"The recent Rotterdam developments should make it interesting for us to enter the diamonds picture. * * * Please discuss with Cremer."

The "Rotterdam developments" were, of course, the devastation of Rotterdam by the German Air Force which had occurred a short time before. Cremer was one of the German officials whom von Clemm had called upon during his 1939 visit to Germany. He had experience in the diamond business. In 1940 he was sent by the German Government to Belgium to advise the German military government there as to the sale in the United States of Belgian diamonds as a means of obtaining needed dollar exchange for the German Government.[9]

There is in evidence a memorandum dated October 25, 1940 which Cremer submitted to Major Lemberg, the German military government official in charge of the Belgian diamond business. This memorandum begins:

"The isolation of Belgium from the entire other foreign world makes resumption of the diamond export possible only with the assistance of Germany as mediator. * * * In accordance with personal conferences, the Imico-Handel, Berlin (International Mortgage Handels G.m.B.H.) takes over the function of the necessary intermediate agency in Germany."

It may reasonably be inferred that these "personal conferences" were conferences between Cremer and Carl von Clemm of Imico, conferences which Werner von Clemm had suggested on May 21, 1940.

The Cremer memorandum proceeds to explain the procedure to be followed. Belgian diamonds are to be shipped from Belgium to Imico in Berlin by courier. It will be the "task of Imico to obtain the required statistical papers, export currency declarations and above all, the American consular papers which are necessary for the dispatch of the parcels." After Imico has submitted a parcel for inspection by the "duty officer of the Wehrmacht," Imico will send it to "the cloaking agent in Portugal" who will transmit it to New York. The buyer in New York will make payment to a New York bank for the account of RKG Berlin [the bank in which the Imico and Pioneer accounts were kept] in favor of Imico. The memorandum goes on to say:

"Imico reports the receipt of payment to the Commissioned Official [the German military government] who thereupon disposes of the amounts."

For its services Imico will receive 10 per cent of the invoice amount out of which it must pay transportation, insurance, "cloaking costs," and all other expenses, for which it must account to the Commissioned Official.

The evidence establishes beyond question that the program recommended by Cremer was carried out. Major Lemberg testified that Imico was the "decisive agency through which exports to America were channeled," and that "the export transactions of Imico to the United States were not carried out in its own name, but as a commercial agent for the German Governmental Agency." He also testified that between October 26, 1940 and early February 1941, six packages of diamonds were sent from Belgium to Berlin pursuant to this plan.

Shortly after the date of Cremer's memorandum, a diamond merchant in New York received a letter from its

9. These diamonds are referred to in various German documents as the "Jew" diamonds. The government suggests that they were stolen by the Germans from the Jews in Belgium, but this allegation was never proven.

Von Clemm is still in the import business at the present time and still does business with Cremer.

former supplier in Belgium offering diamonds for sale. Stapled to this letter was a separate piece of paper instructing the buyer to make payment to a New York bank for the account of RKG for Imico and directing him to address all communications to "Carlos H. de Panan" in Lisbon. (Carlos H. de Panan was an alias for Carlos Hoepfner.) The Belgian diamond dealer who wrote this letter testified that he was directed to write it by Major Lemberg, that he delivered it to Major Lemberg in Antwerp and never saw it again. The letter arrived in New York franked with a German postage stamp, hence it must have been sent by Major Lemberg to Germany and mailed from there to the United States.

On June 27, 1940, Imico wrote to Pioneer, as usual in code, enclosing a list of various sizes of diamonds and asking von Clemm to obtain price quotations for them from potential American buyers. The memorandum stated:

"The Reich Economic Ministry want to do business with us and you * * * your commission to be 2 per cent."

The letter states that shipment would be made via Lisbon.

Subsequent correspondence, which need not be recounted in detail, makes it clear that von Clemm knew that he was being asked to sell Belgian diamonds in the United States on a commission basis for Imico, which in turn was acting as an agent for the German Government. Von Clemm was advised several times that he was merely a "trustee" of the diamonds, that he would acquire no title to them, that Imico did not own them, and that Imico was acting for the German Economic Ministry.

Three separate shipments of diamonds arrived in this country, each addressed to Pioneer. Von Clemm succeeded in clearing the first diamond shipment through U. S. customs on the representation that they were of German origin. He sold them in the United States. They thus escaped seizure and are not directly involved in this case.[10] The second shipment, of two packages, and the third, of four packages, covered by invoices from Imico to Pioneer dated respectively December 4, 1940 and February 17, 1941, were detained by the U.S. Customs upon their arrival in this country and were never delivered to Pioneer. These are the packages which were eventually vested by Vesting Order No. 4755 on March 14, 1945 and which were ultimately sold by the Alien Property Custodian.

The evidence satisfies me and I so find that these diamonds were of Belgian origin, that they were sent through Imico to von Clemm pursuant to the German Government's plan heretofore outlined, and that von Clemm knew this to be true.

*The Synthetic and Semi-Precious Stones*

For centuries an industry of cutting semi-precious stones has existed in the vicinity of Idar-Oberstein in the Moselle Valley in Western Germany. Originally the stones were quarried in the nearby mountains. When local supplies became exhausted, topazes, emeralds and the like were shipped into Idar from various parts of the world and were there cut into cameos, intaglios and various other shapes and styles. Although little or nothing was said at the trial about the synthetic stones, as distinct from the semi-precious, I gather that these also were manufactured by the Idar stone cutters.

The United States has long been the principal market for these stones. Demand for them has existed here for use in school rings, among other purposes. The various stone cutters of Idar each had their established customers in the United States to whom they regularly shipped their products.

Beginning in 1935, the German Government organized all German industry into groups which were directed by the German Economic Ministry through an organization of governmental agencies and sub-agencies. Although industry was not completely nationalized, in the

10. This is the shipment which was involved in the criminal prosecution of von Clemm for conspiracy in 1942.

sense of transfer of actual ownership to the state, it was completely controlled and could operate only under German governmental supervision. The stone cutting industry of Idar-Oberstein was a sub-group within the Economic Group of Metal Goods and Related Branches. The Economic Ministry directed the operations of the members of that group through an agency known as the Examination Agency which in turn transmitted its directives to a Preliminary Examination Agency located in Idar, which in turn transmitted them to the stone cutters themselves. A primary purpose of this governmental supervision was to control the export of the stones.

In or about September 1939, this governmental agency informed the stone cutters that they would no longer be permitted to ship their stones directly to their customers in the United States. They were advised that all exports must be sent to Eurohandel which in turn would send them through neutral ports to Pioneer in New York for sale. On October 10, 1939, Eurohandel cabled to Pioneer:

"RWM [German Ministry of Economics] appoint you sole importer synthetics."

This was the beginning of the semi-precious stone business which von Clemm carried on under one firm name or another from then until at least December 11, 1941 and which rapidly became his principal business.

When Imico was formed in late 1939 or early 1940, Imico immediately was designated by the German Economic Ministry as sole exporter of the stones in place of Eurohandel. It paid the stone cutters in Germany for the merchandise. Von Clemm paid Imico, that is to say, he transmitted dollars to bank accounts in neutral countries, first Luxembourg and the Netherlands and later Switzerland, and these accounts were drawn upon by Carl and his associates under his blanket authority from von Clemm.

Some of the stone cutters were unhappy with this arrangement. They preferred to deal directly with their American customers, and for a time some of them persisted in communicating with their customers. Some even went so far as to send to their customers, for their information, copies of the stone cutters' invoices to Imico.

Von Clemm put a stop to this. On May 20, 1940, he sent a memorandum to Signor Francesco Vinci, Milano, Italy, i. e., Carl von Clemm, stating flatly that "this letter is our considered and final notice to you that we will close this office unless we receive from you and tanwo full assurance that every direct communication (2-rals-3-rals) stop." [Tanwo was von Clemm's code word for the German Economic Ministry. "2-rals" was his word for the German stone cutters. "3-rals" was his word for the American stone buyers.] The memorandum goes on to say that:

"We are astounded that people usually so efficient would at this time not yet have instituted a code satisfactory for all 2-rals. In not doing so, one of the most important items in preparation for economic warfare has been overlooked. It is our sincere wish that you will make this memorandum available as food for thought to our tanwo friends."

This memorandum brought results. On June 21, 1940, the chief of the German Government Preliminary Examination Agency sent a circular to all stone cutters in Idar pointing out:

"* * * for the last time that under no circumstances whatever at the present moment may the local firms communicate directly with U.S.A. firms * * *. I have been authorized to inform you that should any firm again infringe this regulation the firm concerned will be excluded in the future from export."

Until June 14, 1941, when Executive Order 8389 was made applicable to Germany, no license was needed for the payment of the purchase price of the stones. Almost down to that date von Clemm secured the entry of the imported stones through U.S. Customs without undue difficulty. The British were difficult, how-

ever, and some shipments were intercepted, even though Imico sent them through neutral ports. Von Clemm carried on his correspondence about them in code letters addressed to fictitious persons in neutral countries. Hoepfner commented on these transportation hazards in a memorandum to von Clemm (addressed as Bill Reck) dated August 9, 1940, in which he took occasion to state:

"Your being sole agent does not at all depend on the American rals [stone buyers] but rests completely with tanwo [German Economic Ministry]. Inasmuch as there will be no other source available for your rals but darei [Germany], your position is getting stronger, not weaker."

On June 18, 1941, four days after the amendment to Executive Order 8389, the chief of the Preliminary Examination Agency sent a "confidential" memorandum to "the Imico firms," i. e., the German stone cutters, stating:

"Since not only German assets but all European assets in U.S.A. have been frozen by order of the American authorities, all further export of German goods to U.S.A. must cease."

However, on September 23, 1941, this prohibition was rescinded. In a memorandum labeled "secret" to the "Imico firms," the chief of the Preliminary Examination Agency stated:

"I herewith inform you that effective immediately shipments for the Imico can be mailed again with the Shipment Control Agency. Excluded therefrom are all engraved articles. (Intaglios and cameos).

When shipping the following must be observed:

1. The paper and paste-board wrappings used in packing must have an entirely neutral character. The outer wrapper (box) must bear only the stamp of the firm. An address is not necessary."

Intaglios and cameos were excluded because these types were distinctively German and could easily be recognized as such.

On October 29, 1941, another memorandum was sent by this agency to the stone cutters on the subject of "maintaining of secrecy with respect to the USA exports procedure." The memorandum states:

"It has become necessary to point out again that it is strictly prohibited to inform your USA customers directly, in any way whatsoever (even privately) that the export-business with the USA has been resumed again."

The stones were shipped by Imico through Georges Lambercier in Switzerland. This traffic had begun even before June 1941. The first invoice from Lambercier to Alison is dated February 8, 1941. On April 9, 1941, Imico asked the German Economic Ministry for permission to open a bank account in Switzerland "as a cloak." Lambercier was to pay into this account the amount of Imico's invoice to him for the stones, but Imico would immediately repay this amount to Lambercier the next day. The purpose was to make it appear that Lambercier had paid for the stones so that it could be represented to the American authorities that the stones were the property of a Swiss national and that the German cutters had been fully paid. In fact, Lambercier did not pay for them.

On March 7, 1941, von Clemm invited Lambercier to become a limited partner in Bridge. The new partnership agreement was signed on April 26, 1941.

The 270 packages of semi-precious and synthetic stones involved in this action were invoiced by Lambercier in his name. Most of them were sent by him to Bridge, although 40 packages appear to have been addressed to Alison and, for some unexplained reason, seven were addressed to Pioneer. They arrived in New York by mail on various dates between April and August 1941. The post office delivered the packages to U.S. Customs. Customs refused to permit von Clemm (operating as Pioneer or Alison or Bridge), to enter the stones. Many of the packages were transferred by Customs from "General Order Storage" to "Special Order Storage," but they remained under Customs

control at all times until finally, in 1945, the Alien Property Custodian vested 263 packages as the property of Bridge and seven as the property of Pioneer.

Von Clemm applied for licenses to pay Lambercier for the stones. In some cases licenses were granted and von Clemm transmitted various dollar amounts to Lambercier's account in Switzerland. In those applications the stones were accurately described as of German origin, but von Clemm represented that Lambercier had paid the German shipper for them, which was not the fact.

The evidence as a whole, only part of which I have recited here, makes it clear that these stone transactions were carried on at the direction of the German Government through the medium of Imico and Pioneer, and that Lambercier was merely a "cloak." It is equally clear that von Clemm knew this. I so find.

But there is more to it than this. At least part of the dollars which von Clemm transferred to Europe in various lump sums from time to time found their way to the German Navy. A "cloaking account" was set up in a bank in St. Moritz, Switzerland, by the German Navy under the name of "Jalmac." As early as December 20, 1939, von Clemm was advised by Banque Commerciale Luxembourg that on the instructions of Leising it had paid $54,000 out of funds remitted to it by Pioneer to the Jalmac account. Payments were made to this account out of funds transmitted by von Clemm to Lambercier in 1941. The word "Jalmac" appears in von Clemm's books.

Although von Clemm testified that he did not know what "Jalmac" meant, I do not believe this testimony. Von Clemm was intimately familiar with all the details of his business. The significance of the word "Jalmac" in his books could not have escaped him.[11]

There is testimony to the effect that the German Navy paid Imico a premium for the dollars. Whether this is true or not is immaterial. Doubtless the German Government required Imico to turn the dollars over to the Navy. That must have been one reason, at least, why Imico enjoyed such a favored status as the sole exporter of the stones. Von Clemm claimed that he did not know this. I do not believe this testimony either. I find that von Clemm was aware of the fact that a substantial part of the dollars which he transmitted to Europe were paid to the German Navy, which thereby acquired much needed foreign exchange.

*Events After Declaration of War*

The United States went to war with Germany on December 11, 1941. Von Clemm's activities thereafter, as far as the evidence discloses, were as follows:

On December 18, 1941, he sent a cable to Lambercier asking him to send "proof" with respect to the first diamond shipment. Presumably the "proof" was to be documents purporting to show that the diamonds were German rather than Belgian. There is nothing to indicate that Lambercier ever complied with this request. In this cable von Clemm also took occasion to inform Lambercier that he could not transmit funds under a certain license because the merchandise was held pending investigation.

On January 27, 1942, Alley, who was not only trustee for von Clemm's children, but was also a lawyer who advised von Clemm on occasion, wrote to him informing him that Lambercier had been placed upon the Proclaimed List of Blocked Nationals issued by the United States Treasury Department. Alley expressed the opinion that this might make Lambercier an enemy within the meaning of the Act. Consequently, he advised von Clemm not to trade with Lambercier, and he further advised that Bridge, in which

---

11. On May 27, 1940 Imico wrote to von Clemm:

"Nelson and we anxious to receive further granit."

"Granit" was the code word for dollars. "Nelson" was a nautical pseudonym for a former naval officer named Fetzer, then associated in some way with Carl von Clemm. He was also referred to by von Clemm as "Neptune."

Lambercier was a special partner, be immediately dissolved.

Von Clemm answered this letter on January 28, 1942. He expressed his agreement with Alley's advice and said that he would "take all steps as suggested by you to wind up its [Bridge's] affairs in accordance with the applicable law and the freezing orders."

If he took such steps, there is no tangible evidence of them. No dissolution agreement or other record of the termination of Bridge was offered in evidence.[12]

In his letter of January 28, 1942 to Alley, von Clemm also said:

"I will also notify the Treasury Department of the situation with regard to Mr. Lambercier and the fact that the company is dissolved."

There is no evidence that von Clemm ever so advised the Treasury Department.

In March 1942 von Clemm received a letter dated January 7, 1942 from Le Coultre & Cie of Geneva stating that by order of A. Baccala of Switzerland, it had consigned two boxes of stones to Bridge. Von Clemm had solicited business from A. Baccala in September 1941 at Lambercier's suggestion. Von Clemm did not accept the shipment of stones from Le Coultre but he turned the business over to another dealer, who did import them. They were vested by the Alien Property Custodian by Order No. 7611 dated September 18, 1948.

On April 21, 1942, von Clemm, as general partner of Bridge, applied to the Federal Reserve Board, pursuant to Executive Order 8389, as amended, for a license to pay $19,803.81 to the blocked account of Georges Lambercier in a New York bank. The application stated that Lambercier was a special partner of Bridge. It stated that the $19,803.81 was the purchase price of stones shipped

from Lambercier to Bridge which were being held at Customs. It stated that a license releasing this merchandise to Bridge had been granted but that nevertheless Customs would not release the goods unless it received either additional duty or evidence that the purchase price had been paid. Von Clemm sought the license in order to be in a position to pay that price.[13] The application was denied, and as far as appears, von Clemm never received the stones.

On April 24, 1942, the grand jury in this district indicted von Clemm, Pioneer, Carl von Clemm, Hoepfner and Cremer for the crime of conspiracy. The gist of the offense charged was that defendants had conspired to import diamonds which were cut in Holland or Belgium under false declarations that they were cut in Germany, and that defendants had also conspired to cause the diamonds to be paid for without obtaining the license required by the "freezing order," i. e., Executive Order 8405, an amendment to Executive Order 8389. The property involved was the first diamond shipment heretofore discussed. Only von Clemm and Pioneer stood trial, the other defendants being in Germany. Von Clemm and Pioneer were convicted. Pioneer was fined and von Clemm was sentenced to a prison term which he served. United States v. Von Clemm, 136 F.2d 968 (2d Cir. 1943), cert. denied, 320 U.S. 769, 64 S.Ct. 81, 88 L.Ed. 459 (1943).

*Conclusions*

The primary question to be decided is whether, on the foregoing facts, von Clemm was an "enemy," that is to say, whether he was an "agent" of the government of a country, i. e., Germany, with which the United States was at war. It is helpful to deal with this problem in two steps: (1) was von Clemm an agent of Germany before war was declared on December 11, 1941, and (2) if so, did he

---

12. In Alley v. Clark, 71 F.Supp. 521 (E.D. N.Y.1947), Alley alleged that the partnership terminated on April 27, 1946.

13. The goverment contends, and, although the evidence is not very clear, it appears to be the fact, that von Clemm had already paid for a part of the merchandise referred to in this application.

continue to be such an agent after that date.

The Act does not define the word "agent." The few judicial decisions in this field do not discuss the definition in any detail. The cases assume that it means one who acts directly or indirectly for the benefit of the foreign government. The agent may be employed directly by that government, and his acts may be directly and immediately related to the war effort of that country, as for example, when he engages in intelligence work or in propaganda. Sarthou v. Clark, 78 F.Supp. 139 (S.D.Cal.1948); Hansen v. Brownell, 98 U.S.App.D.C. 239, 234 F.2d 60 (1956).

■■ But this is not necessarily the case. A man may be an agent of a foreign government even though he is not on its payroll and even though his work is less dramatic than espionage. The purpose of the Act has been said to be "to make it impossible to aid the enemy (Germany) by forbidding that money or property of any kind held in the United States should reach the hands of the enemy. The intention was to make it impossible for a dollar to inure to the advantage of Germany." Stadtmuller v. Miller, 11 F.2d 732, 733–734, 45 A.L.R. 895 (2d Cir. 1926).

Employment in a commercial capacity by a German business corporation which manufactured and sold equipment to the German Armed Forces has been held enough to prevent a plaintiff from maintaining an action under Section 9(a). Rusche v. Brownell, 136 F.Supp. 835 (D.C.1955), aff'd, per cur. 100 U.S.App. D.C. 334, 244 F.2d 782 (1957).

And in a criminal prosecution for conspiracy to violate 22 U.S.C. § 233, which requires an agent of a foreign government to register with the Secretary of State, it has been held that a defendant who in 1940 collected non-confidential information on American aircraft production at the request of a German commercial corporation, which was acting for the German Government, was properly found to be an agent of the German Government and hence guilty for failure to register. United States v. Heine, 151 F.2d 813 (2d Cir. 1945), cert. denied, 328 U.S. 833, 66 S.Ct. 975, 90 L.Ed. 1608 (1946).

Although it arose under a different statute, the case is analogous to the present one, as far as the definition of "agent" is concerned.

The evidence in the present case demonstrates that at least up to the outbreak of war between Germany and the United States, von Clemm directly used his best efforts to provide dollars for the German Government for the Belgian diamonds and that he succeeded in doing so with respect to one shipment. In this endeavor von Clemm acted with Imico, that is to say, with his brother Carl and Carl's associates, who in turn were acting for the German Government. The evidence further demonstrates that at least as an indirect consequence of his transactions in importing semi-precious stones, dollar exchange was procured for the German Navy. The diamond transactions were carried out at the instigation and direction of the German Government, for the purpose primarily of securing this dollar exchange. The semi-precious stone transactions were carried out under the control of the German Government. In both the diamond transactions and the semi-precious stone transactions, von Clemm knew that his operations were beneficial to the German Government.

Von Clemm's dealings were more than the normal operations of an American citizen engaged in the import business solely for the purpose of private gain. It may be that von Clemm sought a personal profit out of his transactions. If he did, the evidence indicates that he was unsuccessful.[14] I believe that the

14. According to Pioneer's federal income tax returns, Pioneer suffered a loss of $148,637.26 in 1939 and $26,305.20 in 1940. Throughout these years von Clemm's personal salary from the business was modest, $10,121 in 1939 and $8,000 in 1940. He increased his salary in 1941 solely in order to obtain the funds necessary to make the capital contributions to Bridge for himself and for Alley and for Lambercier.

profit motive was mingled in his mind with a desire to be of service to Germany. But whatever his motives, we must consider his acts. In the diamond transactions, he acted on behalf of the German Government in collaboration with his brother in Germany. This court so found in the criminal case with respect to the first diamond shipment. A similar finding is justified, and indeed compelled, by the evidence here as to the other diamond shipments. As to the semi-precious stones, von Clemm knew that were it not for the direction of the German Government, he would not be sole importer of this merchandise. He insisted on being sole importer. He gave advice to his "tanwo friends" (i. e., the German Economics Ministry), on how to conduct "economic warfare." He knew that at least some of the dollars that he paid for the stones ultimately were deposited to the credit of the German Navy.

■ Although no case exactly similar to this one has heretofore arisen, it is my opinion that this is the type of conduct which the Trading with the Enemy Act was intended to reach. I conclude, therefore, that at least until December 11, 1941, von Clemm was an agent of the German Government within the meaning of the Act.

This brings us to the second and more difficult phase of the problem. Was von Clemm an agent of the German Government after December 11, 1941? Unless he was, he was not an enemy, as the Act defines that term.

■ I do not accept the government's contention that von Clemm's conviction of conspiracy under an indictment which charged, in the usual manner, that the conspiracy continued "up to and including the date of the filing of this indictment" in April 1942, is enough to establish that von Clemm acted as an enemy agent after war was declared. The criminal case was actually concerned, whatever the indictment alleged, with an importation of diamonds which occurred before December 11, 1941.

■ Nor do I accept the intervenors' contention that von Clemm could not have been an agent of Germany after December 11, 1941 because of the doctrine of the law of agency that the outbreak of war may terminate the authority of the agent to act for his principal.

See Restatement (Second), Agency § 15 (1958)

This rule can have no application to the type of agent with which the Trading with the Enemy Act is concerned. In dealing with that Act, it would be absurd to hold that the very event which brings the Act into play, i. e., a declaration of war, makes it impossible for one who has previously been an agent of Germany to continue to be such an agent.

The question must be decided upon the evidence in the present case, bearing in mind that the burden is on plaintiff to prove a negative, i. e., that he was not an enemy. The evidence as to the affirmative acts of von Clemm after December 11, 1941 is not extensive. I have already summarized it. In substance it comes down to (1) sending a cable to Lambercier on December 18, 1941,[15] (2) turning over the Baccala stone shipment to another importer in March 1942, and (3) making application for a license to pay money into a blocked account of Lambercier in April 1942.

If there were no other evidence in this case and if the burden of proof were upon the government, it is by no means clear that these three incidents, by themselves, would justify a finding that von Clemm acted on behalf of the German Government after December 11, 1941. But there is other evidence in the case, a great deal of it, as to what von Clemm did before December 11. What he did

---

15. The government contends that the mere sending of this cable, in wartime, to Lambercier, was a violation of Section 3 of the Act, which makes it an offense to communicate with an enemy. See United States v. Krepper, 159 F.2d 958 (3rd Cir. 1946), cert. denied, 330 U.S. 824, 67 S.Ct. 865, 91 L.Ed. 1275 (1947). Even assuming this to be correct, it does not necessarily follow that one who sends a cable in violation of this section is an enemy agent.

after December 11 was part of a continuous course of conduct which began long before that date. In judging the significance and effect of what he did after December 11, we cannot properly be asked to shut our eyes to everything that went before.

In my opinion the evidence shows that von Clemm, as far as he was able in the brief period available to him between the declaration of war on December 11, 1941 and his indictment on April 24, 1942, tried to carry on as well as he could with what he had previously been doing. I can see no other explanation of his attempt to secure a license for a payment to Lambercier's account in April 1942, an attempt which he made just three days before his indictment. He had been advised by Alley in January not to trade with Lambercier. Yet here, in April, he is still attempting to deal with him. He is still seeking delivery of several shipments of stones which Lambercier had sent him. Von Clemm was advised by Alley in January to dissolve the partnership with Lambercier. Yet in April, he is still representing to the Federal Reserve Bank that Lambercier is a partner.

I am not unmindful of the fact that it was impossible for von Clemm to enter into new import transactions with German shippers or their Swiss "cloaks" after war broke out. As a practical matter, it had been just as impossible for him to complete such import transactions for several months before war was declared, for shipments to him were detained by the American authorities during that period. But it does not follow that von Clemm could not be an agent of Germany after December 11 because he could not successfully import. Suppose that a man was engaged before December 11, 1941 in stealing United States government documents for transmission to Germany, and suppose that after December 11, he attempted to purloin more documents but was frustrated in his attempt. Was he any the less a German agent because his efforts after December 11 were futile?

Once we start with the premise that von Clemm's activities before December 11 made him a German agent at that time, a premise which I believe to be sound for the reasons already indicated, then the burden is upon von Clemm to show that he discontinued those activities upon the outbreak of war. And since the burden of proof is upon him, significance attaches not only to what was proved as to events after December 11, but also to what was not proved. Thus, if von Clemm had come forward with credible evidence to show that, whatever he did before December 11, he definitely ceased operations as soon as war was declared, a different question would be presented. He did not come forward with such proof. He did not establish that after December 11, 1941 he discontinued conduct which had previously lacked only a declaration of war to bring it within the prohibition of the statute.

Von Clemm did testify that he went out of business after December 11, 1941 and that he so notified Lambercier. He testified that Lambercier insisted on shipping more goods to Bridge, "whereupon I not only wrote letters and said 'We are in difficulties; do not ship any more goods,' but we accompanied this endeavor to make him desist from shipments by a telegram in which we specified that no goods were to be shipped. * * *" No such letter or telegram was ever produced, nor was the failure to produce them satisfactorily explained. In view of their crucial importance, the failure to produce them militates very strongly against the credibility of von Clemm's oral testimony.[16] His testimony

16. It is true that von Clemm's files were seized by the government, apparently long before this action was begun, and remained in its possession. But it appears that plaintiff's attorneys had access to these files before the trial. Moreover, very early in the trial I directed the government to make these files, including the correspondence files, available to von Clemm for his inspection, and I adjourned the trial to give him an opportunity to examine them, an opportunity of

is also inconsistent with his subsequent application for the license.

Further doubt is cast upon it by the fact that on January 9, 1942, Imico in Berlin wrote to the Reich Economic Ministry stating that Pioneer or Bridge owed Imico RM 370,000 on Imico's merchandise claim and approximately $110,000 with respect to Imico's claim "from the so-called Jew diamonds from the holdings of the Four-Year Plan." The letter states that Pioneer "has placed payment applications with the competent Ministry of Finance [Federal Reserve Bank] for payment," and that Imico has:

> "* * * made provision to make possible the transfer of these dollars via Switzerland, in spite of the so-called 'freezing.' In spite of the state of war, it is therefore to be expected that in the course of time the sum owed will be unfrozen, as soon as the customs, where the goods still are which offset the value of the claim, will have released them."

Granted that there is no reason to believe that von Clemm knew of this letter when it was written in January 1942, still the letter shows the state of mind of Imico at that time, and Imico's belief that in spite of the war the money would eventually be transmitted by von Clemm via Switzerland. In view of the close association between von Clemm and Imico, Imico's state of mind has relevance in determining von Clemm's state of mind. In the light of all the evidence, I cannot accept von Clemm's oral testimony that he informed Lambercier as soon as war was declared not to ship any more goods.

■ I am called upon to decide this question without the benefit of controlling authority either way. I hold that von Clemm has failed to prove that he was not an agent of Germany, within the meaning of the Act, after December 11, 1941, and hence that he may not maintain this action under Section 9(a).

*Enemy "Taint"*

I turn now to the doctrine of enemy "taint" on which the government relies. This doctrine had its origin in the first *Uebersee* case, Clark v. Uebersee Finanz-Korporation, A. G., 332 U.S. 480, 68 S. Ct. 174, 92 L.Ed. 88 (1947). That was an action under Section 9(a) by a Swiss corporation to recover property which the Alien Property Custodian had vested pursuant to Section 5(b) of the Act. It came to the Supreme Court on the pleadings. The complaint alleged that plaintiff corporation was not only incorporated in a non-enemy country, but that it did no business in the territory of an enemy or any ally of an enemy. Therefore, under the literal wording of Section 2(a), it was not an enemy and hence was entitled to maintain the action. The Supreme Court had so held in a similar case in 1925. Behn, Meyer & Co., Limited, v. Miller, 266 U.S. 457, 45 S.Ct. 165, 69 L.Ed. 374 (1925).

But under the Act as it read in 1925, the Custodian could not have vested the property in the first place, for at that time the Act permitted vesting only if the owner of the property was an enemy. In 1941, however, Section 5(b) of the Act was amended to permit vesting of property in which any foreign national, whether enemy or not, had an interest. Congress, however, failed to amend Section 9(a) which then, as before and since, permitted anyone not an enemy to sue to recover his vested property. Congress also failed to amend the definition of enemy in Section 2(a).

The Court was thus faced with an inconsistency between the two portions of the Act. It solved this dilemma by reading into the definition of enemy in Section 2(a) something which was not there. It said in effect that a corporation, even though incorporated in a neutral country, and even though it did no business in an enemy country, might nevertheless be affected by an enemy "taint" which

which he availed himself. If these important documents existed, he should have found them. There is no reason whatever to suspect that the government suppressed them.

would make it unable to sue under Section 9(a). The enemy taint arose from the enemy character of the corporation's stockholders. Under what circumstances a corporation would be thus tainted, the Court found it unnecessary to decide in the case before it.

Thereafter the case was tried. It appeared that the stock of Uebersee was registered in the name of Fritz von Opel, a German who claimed to be a resident of Lichtenstein. His parents, Wilhelm and Marta von Opel, who were citizens and residents of Germany, were found to have a usufructuary interest in the stock. The district court found that because of the enemy status of its stockholders, the corporation, Uebersee, was tainted and could not recover. Uebersee Finanz-Korporation, A. G. v. Clark, 82 F.Supp. 602 (D.C.1949). The Court of Appeals affirmed. Uebersee Finanz-Korporation, A. G. v. McGrath, 88 U.S.App.D.S. 183, 191 F.2d 327 (1951).

The case then went to the Supreme Court a second time. The Court affirmed the judgment in favor of the Custodian on Uebersee's claim. Uebersee Finanz-Korporation, A. G. v. McGrath, 343 U.S. 205, 72 S.Ct. 618, 96 L.Ed. 888 (1952).

It said (343 U.S. at 212, 72 S.Ct. at 621):

"As construed by this Court in Clark v. Uebersee Finanz-Korp., A. G., supra [332 U.S. 480, 68 S.Ct. 174, 92 L.Ed. 88], § 2 included in the word 'enemy' all corporations affected with an 'enemy taint.' Since we find petitioner to be so affected because of the direct and indirect control and domination by an enemy national, Wilhelm von Opel, petitioner cannot recover under § 9(a)."

There were still further proceedings in this protracted litigation which may be briefly summarized. In Kaufman v. Societe Internationale, 343 U.S. 156, 72 S.Ct. 611, 96 L.Ed. 853 (1952), decided

on the same day as the second *Uebersee* case, the Supreme Court held that even though the corporate veil can be pierced, so that a corporation incorporated in a neutral country may be tainted by its enemy stockholders, nevertheless "innocent," i. e., non-enemy, stockholders are entitled to recover from the Custodian their pro rata share of the corporation's vested assets. In the second *Uebersee* case, therefore, the Supreme Court directed a further trial on the issue of whether Fritz von Opel was an innocent stockholder.

This issue was tried in the district court which found that Fritz was not innocent and hence not entitled to recover any part of the assets of his tainted corporation because he was an enemy within Section 2(a) and also because he was "infected with enemy taint." Uebersee Finanz-Korp., A. G. v. Brownell, 133 F.Supp. 615 (D.C.1955).

The Court of Appeals affirmed, without, however, passing upon the question of enemy taint. Von Opel v. Brownell, 100 U.S.App.D.C. 341, 244 F.2d 789, cert. denied, 355 U.S. 878, 78 S.Ct. 141, 2 L.Ed.2d 108 (1957).

■ Inasmuch as I have held that von Clemm has failed to prove that he was not an enemy agent within the meaning of the Act, it necessarily follows, under the rule of the *Uebersee* cases, that if von Clemm owned all the stock of Pioneer, as he claims, Pioneer is tainted by the enemy status of its stockholder and hence may not sue under Section 9(a) to recover the proceeds of the diamonds. It also follows that Bridge, the partnership, is tainted by the enemy status of its only general partner, and hence may not sue under Section 9(a) to recover the proceeds of the stones.[17]

The government contends that the *Uebersee* cases have an additional significance. These decisions are said to establish the principle that an individual, as well as a corporation, may be infected

---

17. As pointed out early in this opinion, it has been held that Alley, a limited partner of Bridge, has only the rights of a creditor and may not sue under Section 9(a). Alley v. Clark, supra.

with enemy taint, and that if he is, then even though he is not an enemy agent, he is still disqualified from suing.

The District Court in the last *Uebersee* decision so held in denying Fritz von Opel any recovery. Uebersee Finanz-Korp., A. G. v. Brownell, 133 F.Supp. 615 (D.C.1955).

And the District Court in Rusche v. Brownell, 136 F.Supp. 835 (D.C.1955) seems to have assumed that an individual may be tainted.[18]

Moreover, a similar assumption may be thought to underlie the decision in Kind v. Kennedy, 293 F.2d 618 (2d Cir. 1961). That was an action by an individual under Section 9(a) in which the government contended that the plaintiff was affected by enemy taint. The court did not discuss the subject, and its decision was in favor of plaintiff. It did say, however, that plaintiff had always "been a loyal American citizen," and that "[T]here is nothing in the record to indicate disloyal motives on his part or that plaintiff was at any time 'enemy tainted' * * *." (293 F.2d at 621)

Considered as an original proposition, I would doubt that the taint concept should be applied to individuals. The Supreme Court's *Uebersee* decisions do not go that far. The doctrine there announced was only that a corporation, although not an enemy by statutory definition, may nevertheless be tainted by the enemy status of its stockholders. It does not necessarily follow that an individual who is not an enemy by definition can be barred from suit because of conduct which falls short of making him an enemy agent. And it could well be argued that the reasons which led the Supreme Court to invent the doctrine of enemy taint for corporations, i. e., to prevent an enemy business from hiding behind a neutral corporate veil, do not exist in the case of an individual.

Such authority as there is on the point, however, appears to recognize that an individual may be disqualified from suing by taint as well as by enemy status. On the assumption that he may be so disqualified, I find and conclude that von Clemm's conduct, heretofore discussed at length, is sufficient to constitute the forbidden taint.

### The Issue of Title

Thus far nothing has been said about the several questions which arise on this branch of the case. These questions include (1) whether von Clemm in fact owned the stock of Pioneer despite his contrary representations to the Treasury Department and to the Internal Revenue Service; (2) whether, if he did, he is estopped to so claim by virtue of those representations; (3) whether, if he is not estopped, Pioneer in turn had any beneficial title to the diamonds which, according to Imico, were to be delivered to Pioneer as "trustee"; (4) whether Pioneer or Bridge had any beneficial title to the semi-precious stones which were shipped to them from Germany via Switzerland but which were never delivered because of the intervention of the customs authorities and the eventual vesting in the Custodian. In addition, there is the question of the effect, if any, to be given to the fact that the Custodian in 1945 vested the diamonds and seven packages of stones on the theory that they were the property of Pioneer and vested the remaining 263 packages of stones on the theory that they were the property of Bridge. The vesting orders were later amended in 1948 to allege that both the diamonds and the stones were the property of Imico.

At the trial the government took the position that this court has no power to determine these questions. Its contention is that since plaintiffs have not proved that they were not enemies, the court is without jurisdiction to decide the issue of title. Accordingly, at the close of plaintiffs' case and again at the close

---

18. In affirming each of these decisions, the Court of Appeals for the District of Columbia did not pass upon this question.

**374**

of the entire case, the government moved to dismiss for lack of jurisdiction.

 Albert v. Brownell, 219 F.2d 602 (9th Cir. 1955) supports this contention. On the other hand, in Hansen v. Brownell, supra, the Court decided both the issue of enemy status and the issue of title adversely to plaintiff, thereby necessarily holding, at least by implication, that it had jurisdiction to pass on the issue of title even though it had found against plaintiff on the issue of enemy status. To my mind, this is the sounder view. This court had jurisdiction of this action at the outset, and it seems inaccurate to say that it lost jurisdiction after the trial was over because plaintiffs had failed to prove one of the two elements that they were called upon to prove in order to recover. The situation more properly is to be regarded as one in which plaintiffs have failed to prove a claim, not one in which the court has been deprived of jurisdiction. Cf. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946); O'Neill v. Maytag, 339 F.2d 764 (2d Cir. 1964).

The motion to dismiss for lack of jurisdiction is therefore denied.

Although, in my opinion, the court has power to decide the question of title, it is clearly unnecessary to do so. The conclusion that plaintiffs have failed to prove a status which under Section 9(a) is a prerequisite to suit fully disposes of this case. There is likewise no occasion to pass upon the various contentions of the intervenor defendants who, as noted at the outset of this opinion, were permitted to intervene only for the purpose of defeating plaintiffs' action. They are not entitled to a determination as to the validity of their own claims.

Pursuant to Rule 52(a) this opinion constitutes the court's findings of fact and conclusions of law.

Plaintiffs' motion to strike various exhibits is denied. The Clerk is directed to enter judgment in favor of defendants dismissing the action.

So ordered.